[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-10276
Non-Argument Calendar
_____

D.C. Docket No. 2:14-cr-00023-MHT-CSC-5

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ALBERTO TREJO,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Alabama
_____

(August 24, 2015)

Before TJOFLAT, WILSON, and ROSENBAUM, Circuit Judges.

PER CURIAM:

Alberto Trejo appeals his 360-month sentence, imposed at the bottom of the advisory guideline range, after pleading guilty to conspiring to possess with intent to distribute methamphetamine. On appeal, Trejo argues that his sentence is procedurally unreasonable because the district court erroneously believed it could not downwardly vary from the methamphetamine guidelines based on a policy disagreement with those guidelines. And he argues that his sentence is substantively unreasonable because it is based on those guidelines, which are unduly harsh and unsupported by empirical evidence. After careful review, we affirm Trejo's sentence.

## I.

Trejo and four codefendants were indicted on one count of conspiring to possess with intent to distribute 500 grams or more of a substance containing methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Trejo was accused of organizing and leading the conspiracy while serving a 99-year sentence for second-degree murder in Alabama state prison. Trejo pled guilty to the federal charge without a plea agreement.

In the presentence investigation report, Trejo was held accountable for 12.44 kilograms of "Ice" methamphetamine and 27.7 grams of cocaine. To calculate a single offense level, the probation officer converted these quantities into their marijuana equivalents. *See* United States Sentencing Guidelines Manual

("U.S.S.G.") § 2D1.1 cmt. n.8(B).  Under the Drug Equivalency Tables, one gram of Ice is equivalent to twenty kilograms of marijuana.[1]  *Id.* § 2D1.1 cmt. n.8(D). After conversion, Trejo was held accountable, in total, for the equivalent of 248,805.54 kilograms of marijuana, for a base offense level of 38.  *See id.* § 2D1.1(c)(1) (involving 90,000 kilograms or more of marijuana).  The Ice equivalent accounted for all but 5.54 kilograms of the total amount.

With a four-level increase for Trejo's leadership role and a three-level reduction for his acceptance of responsibility, Trejo's total offense level was 39. Trejo was designated a career offender, under U.S.S.G. § 4B1.1, due to two prior qualifying felony convictions (murder and transporting marijuana for sale), which pushed his criminal history category from V to VI, *see* U.S.S.G. § 4B1.1(b), resulting in a guideline range of 360 months to life imprisonment.[2]  Due to the prior felony drug conviction, Trejo faced a statutory minimum term of 20 years' imprisonment.  *See* 21 U.S.C. § 841(b)(1)(A)(viii).

---

[1] "Ice" is defined as a mixture that is at least 80% pure methamphetamine.  *See* U.S.S.G. § 2D1.1(c) n.(C).  For comparison, one gram of methamphetamine that is not "methamphetamine (actual)" or "Ice" is, under the Tables, equivalent to two kilograms of marijuana.  *Id.* § 2D1.1 cmt. n.8(D).

[2] Trejo's guidelines range remained the same because his base offense level under § 2D1.1 (level 38) was higher than his offense level under the career-offender table (level 37), and the career-offender guidelines provide that the higher level of the two applies.  *See* U.S.S.G. § 4B1.1(b).  Had the career-offender offense level applied instead, his total offense level would have been 38 instead of 39, resulting in the same guideline range of 360 months to life imprisonment.  *See* U.S.S.G. Ch. 5, Pt. A.

Trejo requested a downward variance to the minimum of 20 years' imprisonment, arguing that the methamphetamine guidelines overstated the seriousness of his conduct. To illustrate the point, Trejo asserted in a sentencing memorandum that his offense level would have been lower had he committed second-degree murder or a drug offense involving 440 kilograms of cocaine. And at sentencing, Trejo initially compared the current federal treatment of drug crimes to alcohol prohibition and asserted that thirty years in prison was too much for any drug crime.

In attempting to clarify Trejo's arguments at sentencing, the court identified two categories of variances district courts may impose: (1) the "typical 3553" where "the defendant ha[s] certain individual characteristics that warrant a variance downward"; and (2) where, "as a matter of policy, and regardless as to this defendant, the Court should just not follow the sentencing commission's views about guidelines." The court characterized Trejo's argument as a policy argument—not based on Trejo's individual characteristics—and noted that it "disagree[d] with the calculations of the sentencing commission."

But, according to the court, sentencing courts "should be more reluctant" to grant a variance based on policy disagreements. Further, the court stated, it had only known courts to reject the crack-cocaine guidelines based on policy disagreements. In response, Trejo, for the first time, asserted that his argument

4

was based in part on a sentencing disparity based on methamphetamine purity. The sentences for more pure methamphetamine, he asserted, were ten times more severe than for an equivalent amount of less pure methamphetamine. The district court suggested that even if there were problems with the methamphetamine guidelines, in light of his prior murder conviction, Trejo was "a pretty, pretty violent person" who may not deserve a downward variance on that basis alone.

The district court confirmed that the guideline range was 360 months to life imprisonment, which was uncontested, and then recessed the hearing for the day, noting that it needed additional time. When sentencing resumed the next day, the court denied Trejo's request for a variance. The court elaborated, "[W]hen you talk[ed] about disparity involving meth, I wasn't quite sure what type of disparity you were talking about, whether it was . . . between the pure and nonpure or meth versus other drugs or what?" The court directed Trejo's counsel to the district court decision of *United States v. Hayes*, 948 F. Supp. 2d 1009 (N.D. Iowa 2013), which, according to the court, discussed the policy arguments against the methamphetamine guidelines in more detail. "But," the court stated, "I don't find any record here that supports a rejection of the policy."

The district court sentenced Trejo to serve 360 months in prison, to run consecutive to the 99-year sentence he was serving. Following the hearing, the court issued a written opinion denying Trejo's motion for a downward variance. In

the opinion, the court explained that Trejo "did not present clear or sufficient evidence as to why the sentencing disparities produced by the methamphetamine guidelines are unwarranted as applied to him," and that "his arguments were conclusory and superficial, and not substantive." Trejo now appeals.

## II.

We review the reasonableness of a sentence under an abuse-of-discretion standard. *United States v. Moran*, 778 F.3d 942, 982 (11th Cir. 2015). In reviewing for reasonableness, we "must first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." *Gall v. United States*, 552 U.S. 38, 51, 128 S. Ct. 586, 597 (2007).

Assuming the district court's decision is procedurally sound, we will then review a sentence for substantive reasonableness under the totality of the circumstances. *Id.*; *United States v. Pugh*, 515 F.3d 1179, 1190 (11th Cir. 2008). "A sentence is substantively unreasonable if it does not achieve the purposes of sentencing stated in § 3553(a)[,]" *Moran*, 778 F.3d at 982 (internal quotation marks omitted), which include the need to reflect the seriousness of the offense,

6

deter criminal conduct, and protect the public from the defendant's future criminal conduct, *see* 18 U.S.C. § 3553(a)(2).[3]

We will overturn a sentence as substantively unreasonable only if "we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." *United States v. Irey*, 612 F.3d 1160, 1190 (11th Cir. 2010) (*en banc*) (internal quotation marks omitted). The party challenging the sentence bears the burden of proving that his sentence is unreasonable. *Moran*, 778 F.3d at 982.

## A.

Trejo contends that the district court erroneously treated the Sentencing Guidelines as mandatory. For support, he highlights the court's comment that sentencing courts should be "reluctant" to reject guidelines based on policy disagreements. He asserts that this statement is contrary to the Supreme Court's decisions in *Spears v. United States*, 555 U.S. 261, 129 S. Ct. 840 (2009), and *Kimbrough v. United States*, 552 U.S. 85, 128 S. Ct. 558 (2007), and shows that the court believed that it could not vary from the guideline range based on a policy disagreement with the methamphetamine guidelines.

---

[3] The district court must also take into account the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the applicable guideline range, any pertinent policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims. 18 U.S.C. § 3553(a)(1), (3)-(7).

In *Kimbrough*, the Supreme Court recognized that "district courts are entitled to reject and vary categorically from the crack-cocaine Guidelines based on a policy disagreement with those Guidelines." *Spears*, 555 U.S. at 266, 129 S. Ct. at 844 (clarifying *Kimbrough*); *see Kimbrough*, 552 U.S. at 91, 128 S. Ct. at 564. Thus, *Kimbrough* recognized a more expansive view of district courts' authority at sentencing, permitting courts "to vary from the crack cocaine Guidelines based on *policy* disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case." *Spears*, 555 U.S. at 264, 129 S. Ct. at 843.

Several of our sister circuits have expressly held that *Spears* and *Kimbrough* mean that district courts have broad authority to premise a variance on disagreement with the policy of any guideline. *See, e.g.*, *United States v. Corner*, 598 F.3d 411, 415 (7th Cir. 2010) (*en banc*) ("We understand *Kimbrough* and *Spears* to mean that district judges are at liberty to reject any Guideline on policy grounds—though they must act reasonably when using that power."); *United States v. Cavera*, 550 F.3d 180, 191 (2d Cir. 2008) (*en banc*) ("[A] district court may vary from the Guidelines range based solely on a policy disagreement with the Guidelines, even where that disagreement applies to a wide class of offenders or offenses."); *United States v. Herrera-Zuniga*, 571 F.3d 568, 585 (6th Cir. 2009) (collecting cases). Consistent with these circuits, in *Irey* this Court recognized that

"*Kimbrough* allows a district court to vary from the guidelines based solely on its judgment that the policies behind the guidelines are wrong." *Irey*, 612 F.3d at 1212.

Here, the record contradicts Trejo's contention that the district court treated the guidelines as mandatory.[4] In addressing Trejo's request for a variance—the focus of the sentencing hearing—the court recognized its general authority to vary where, "as a matter of policy, and regardless as to this defendant, the Court should just not follow the sentencing commission's views about guidelines." While the court may not have been familiar with policy-based variances outside of crack-cocaine cases on the first day of sentencing, the court never suggested that it could not grant a variance outside of those cases. And, after recessing the hearing for the evening, the court appears to have conducted independent research regarding the alleged flaws in the methamphetamine guidelines. When the hearing resumed, the court denied the motion for a downward variance because Trejo had not established a "record here that supports a rejection of the policy."

Trejo places heavy emphasis on the district court's statement that sentencing courts "should be more reluctant" to grant variances based on policy disagreements than variances based on individual circumstances. But the statement itself implies

---

[4] Trejo does not contend that the district court failed to calculate the guideline range or to consider the § 3553(a) sentencing factors, and the record otherwise shows that the court did not err in these respects. *See Gall*, 552 U.S. at 51, 128 S. Ct. at 597.

9

that the court understood it had the authority to grant a policy-based variance. Only if the court believed that it had that authority would it make sense to say the authority should be used reluctantly.

The district court's statement also is not inconsistent with *Kimbrough* and *Spears*. *Kimbrough* explains that the Sentencing Commission and sentencing courts have "discrete institutional strengths." 552 U.S. at 109, 128 S. Ct. at 574. Generally, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise." *Id.* Accordingly, "the Commission's recommendation of a sentencing range will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Id.* (internal quotation marks omitted). The sentencing judge, on the other hand, has greater familiarity with the individual circumstances of the defendant and case before her and therefore is in a superior position to apply the § 3553(a) factors in a particular case. *Id.* The district court's comment about being more "reluctant" to grant a variance based on a policy dispute with the Guidelines merely recognizes that a variance "based solely on the judge's view that the Guidelines range fails properly to reflect § 3553(a) considerations even in a mine-run case," *Id.* at 109, 128 S. Ct. at 575, falls outside of the institutional strengths of a sentencing court.

In short, the record shows that the district court understood it had the discretion to vary downward based on a policy disagreement with the methamphetamine guidelines but that it declined to exercise that discretion because Trejo did not show that a variance was warranted. Trejo has not shown that the district court procedurally erred by treating the methamphetamine guidelines as mandatory.

**B.**

Trejo also contends that his sentence was substantively unreasonable because the methamphetamine guidelines are not based on empirical evidence, and, in his view, their application creates unjustly punitive sentences that are greater than necessary to meet the purposes of sentencing under 18 U.S.C. § 3553(a). He asserts that the district court did not properly weigh and consider these arguments at sentencing. Again, we disagree.

Section 2D1.1's Drug Quantity Table reflects a 10-to-1 sentencing disparity between pure methamphetamine and mixture or non-pure methamphetamine. For example, to receive a base offense level of 38 under the current Guidelines, the offense must involve 45 kilograms or more of mixture methamphetamine or 4.5 kilograms of more pure methamphetamine—"Methamphetamine (actual)" or

"Ice."[5]    U.S.S.G. § 2D1.1(c)(1) (Nov. 2014).    The Drug Equivalency Tables likewise reflect a 10-to-1 disparity between pure and non-pure methamphetamine. *See id.* § 2D1.1 cmt. n.8(D).  The commentary to § 2D1.1 explains that drug purity "is probative of the defendant's role or position in the chain of distribution" and "[s]ince controlled substances are often diluted and combined with other substances as they pass down the chain of distribution, the fact that a defendant is in possession of unusually pure narcotics may indicate a prominent role in the criminal enterprise and proximity to the source of the drugs."  *Id.* § 2D1.1 cmt. n.27(C).

In *Hayes*, which Trejo principally relies upon, a district judge found that the methamphetamine guidelines were not based on empirical evidence, were excessive, and failed to promote the purposes of sentencing under § 3553(a). *Hayes*, 948 F. Supp. 2d at 1025-29.  With respect to the drug-purity disparity, the judge found that, "[w]hile it may seem logical to punish a pure substance more than mixed substance, there is no support in the legislative history to explain the formula underlying greater methamphetamine purity to greater months of imprisonment."  *Id.* at 1025.  The methamphetamine guidelines can, therefore, create an unwarranted disparity, particularly where the offender is "merely a

---

[5] "Methamphetamine (actual)' refer[s] to the weight of the controlled substance, itself, contained in the mixture or substance."  U.S.S.G. § 2D1.1(c) n.(B).  "Ice" is at least 80% pure methamphetamine.  *See id.* § 2D1.1(c) n.(C).

12

courier or mule who has no knowledge of the purity of the methamphetamine he or she is transporting." *Id.* Similarly, the judge concluded, because the Guidelines for drug-trafficking offenses in general are tied to drug quantity—on the assumption that larger amounts indicate greater responsibility—quantity may be a poor proxy for culpability in the case of minor participants in a drug enterprise. *Id.* at 1027-29.

Assuming *arguendo* that the methamphetamine guidelines in general and the 10-to-1 mixture-to-pure methamphetamine ratio in particular are not supported by empirical evidence, *cf. Kimbrough*, 552 U.S. at 95, 128 S. Ct. at 567 (noting that the drug-trafficking guidelines were not developed using an "empirical approach based on data about past sentencing practices," but were instead based on the Anti-Drug Abuse Act of 1986's "weight-driven scheme"), this fact alone would not make Trejo's sentence unreasonable. The lack of empirical evidence is "one factor" that a district court can consider in exercising its authority to vary from the Guidelines. *See United States v. Snipes*, 611 F.3d 855, 870 (11th Cir. 2010). While *Kimbrough* and *Spears* "empowered" district courts with discretion to vary downward based on a policy disagreement with the applicable guidelines, they did not "command" district courts to exercise this discretion. *Dell v. United States*, 710 F.3d 1267, 1279 (11th Cir. 2013).

Here, the district court did not abuse its discretion by declining to vary downward and by imposing a sentence at the bottom of the guideline range. Significantly, many of the primary concerns identified in *Hayes* do not apply here because Trejo was not a minor participant in the methamphetamine distribution conspiracy. Despite being in prison at the time, he was the conspiracy's organizer and leader, with connections to the source of supply in California. Thus, in this case, drug purity in fact "indicate[s] a prominent role in the criminal enterprise and proximity to the source of the drugs." U.S.S.G. § 2D1.1 cmt. n.27(C).

Moreover, we are satisfied that the district judge "considered the parties' arguments and ha[d] a reasoned basis for exercising his own legal decisionmaking authority." *United States v. Ghertler*, 605 F.3d 1256, 1262 (11th Cir. 2010) (internal quotation marks omitted). We find no merit in Trejo's contention that the district court failed to understand or consider his arguments challenging the methamphetamine guidelines. The judge's initial confusion with Trejo's disparity arguments is understandable, given that, in the sentencing memorandum, Trejo's counsel focused on the disparities between drug crimes and violent crimes and between methamphetamine crimes and other drug crimes, but at the sentencing hearing, Trejo's counsel shifted the focus to the drug-purity disparity. Notwithstanding some initial confusion, the record reflects that the judge gave extensive consideration to all of Trejo's arguments, going beyond even what Trejo

14

presented.  Indeed, it was the district judge who brought *Hayes*—the focus of Trejo's briefing on appeal—to defense counsel's attention, not the other way around.  Regarding the drug-purity disparity argument in particular, the judge issued a written opinion explaining why he found this argument unavailing.

Overall, the district court recognized that it had the authority to vary downward based on a policy disagreement with the methamphetamine Guidelines but exercised its discretion not to do so because Trejo had not shown that the drug-purity disparity was unwarranted in his case.  Trejo had a prior conviction for second-degree murder and was operating this drug conspiracy while serving the sentence for that offense.  Also, the 360-month sentence was imposed at the bottom of the guideline range, and we expect that a sentence within the guideline range is reasonable.[6]  *United States v. Alfaro-Moncada*, 607 F.3d 720, 735 (11th Cir. 2010).  Under these circumstances, Trejo's sentence is reasonable.

**AFFIRMED**.

---

[6] We note that, even if the district court had found the methamphetamine guideline range excessive, Trejo does not challenge his status as a career offender, and his guideline range based on the career-offender offense table, U.S.S.G. § 4B1.1(b), was also 360 months to life imprisonment.

15